USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 08/02/2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
AIGNER EL ANSARI,

                              Plaintiff,

                -against-

BRIDGET GRAHAM, *individually*, THE NEW
YORK AND PRESBYTERIAN HOSPITAL,

                              Defendants.
-------------------------------------------------------------- X

17-CV-3963 (VEC)

OPINION AND ORDER

VALERIE CAPRONI, United States District Judge:

      Defendants New York and Presbyterian Hospital ("Hospital") and Bridget Graham move to preclude testimony by Plaintiff Aigner El Ansari's expert, Dr. Yaakov Siegel. Dr. Siegel's report concludes that Defendants' alleged discrimination against El Ansari while she was employed at the Hospital caused her to develop depression and anxiety. *See* Siegel Report (Dkt. 70, Ex. 1) at 10–11. Defendants argue that Dr. Siegel lacks the necessary qualifications, failed to use reliable methods, and is fatally biased due to his relationship to Plaintiff's counsel. *See* Dkt. 71 at 1–2. Because Dr. Siegel's opinion is unreliable and his report violates the requirements of Rule 26 of the Federal Rules of Civil Procedure, Defendants' motion to preclude Dr. Siegel's expert report and testimony is GRANTED.

## I.    BACKGROUND

      Plaintiff Aigner El Ansari sued the Hospital, Bridget Graham, and others for alleged violations of Title VII of the Civil Rights Act, the Americans with Disabilities Act, the Pregnancy Discrimination Act, the Administrative Code of the City of New York, and New York state laws. *See* Dkt. 1 at 1–2. The Court previously granted partial summary judgment in favor of Defendants, but there are six surviving discrimination and retaliation claims pending against

1

the Hospital or Graham.[1]  *See* Dkt. 68 at 1–2.  Defendant now seeks to preclude Dr. Siegel from testifying that Defendants' mistreatment caused Plaintiff to develop severe depression and anxiety.

Dr. Yaakov Siegel, Plaintiff's proffered expert witness, is a licensed psychologist in private practice in New York.  *See* Siegel Report at 2.  He holds a doctorate in Clinical Psychology with a Concentration in Forensic Psychology and has performed forensic evaluations as part of his pre-doctoral internship and post-doctoral residency programs.  *See id.* at 12–15; Siegel Dep. (Dkt. 70, Ex. 2) at 83.  He has experience treating patients with depression, anxiety disorders, and other psychological disorders.  *See* Siegel Dep. at 103–104.

On October 9, 2017, Dr. Siegel evaluated Plaintiff by conducting a clinical interview of her.  *See* Siegel Report at 2.  As part of his evaluation, Dr. Siegel administered seven psychological tests purportedly relevant to the diagnosis of major depressive disorder: three tests based on the patient's self-reported anxiety and other depressive symptoms, one test for depression based on the examiner's observation, two drawing tests for general mental functioning, and one sentence completion test for personality.[2]  *See id.* at 7–10.

---

[1] The motion for summary judgment was denied as to Plaintiff's (1) discrimination claim against the Hospital under Title VII (42 U.S.C. § 2000e-2); (2) retaliation claim against the Hospital under the Americans with Disabilities Act (42 U.S.C. § 12203); (3) discrimination claim against the Hospital and Graham under N.Y. Exec. Law § 296(1); (4) retaliation claim against the Hospital and Graham under N.Y. Exec. Law § 296(7); (5) discrimination claim against the Hospital and Graham under N.Y. City Admin. Code § 8-107(1); and (6) retaliation claim against the Hospital and Graham under N.Y. City Admin. Code § 8-107(7).  *See* Dkt. 68 at 1.

[2] According to Dr. Siegel, the two drawing-based tests are not his preferred diagnostic tools because they are less standardized and more reliant on the psychologist's interpretation than his usual methodology.  *See* Siegel Dep. at 162–63.  Dr. Siegel could not use his preferred Bender-Gestalt Test because he conducted the evaluation while on vacation and did not have the required cards.  *See id.* at 117.  Dr. Siegel also did not use other alternatives that are considered to be more standardized than the drawing tests, such as PHQ-9, MMPI, and M-FAST.  *See* Dkt. 71 at 13–14.  In addition to the seven psychological tests, Dr. Siegel also administered a malingering test to assess whether Plaintiff was being truthful in her responses.  *See* Siegel Report at 10.

To reach a diagnosis, Dr. Siegel adopted the criteria set forth in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-V"). For a finding of Major Depressive Disorder with Anxious Distress, the DSM-V guidelines require that five or more designated symptoms be present during the same two-week period. *See id.* at 6. The report, however, does not make clear the relationship between the DSM-V criteria and the results from the array of tests he performed. *See id.* Nor does the report state which of the DSM-V criteria were met in Plaintiff's case or which two-week period he used to make the diagnosis. *See id.* Instead, it simply concludes that Plaintiff "clearly meets criteria of Major Depressive Disorder with Anxious Distress." *Id.* at 6.

Under the DSM-V guidelines, prior to reaching a diagnosis of Major Depressive Disorder, the clinician must conclude that the five or more qualifying symptoms used to make the diagnosis are not "attributable to the physiological effects of a substance or to another medical condition." *Id.* at 6. Plaintiff appears to have recounted her own medical history during the clinical interview, but Dr. Siegel did not review any of the Plaintiff's medical records or contact any of her medical providers to corroborate her medical history or to obtain their input. *See id.* at 4; Siegel Dep. at 9–10, 30–31.

Based on the clinical interview and a review of the Complaint, Dr. Siegel concluded that Plaintiff's depression was caused or exacerbated by Defendants' conduct.[3] *See* Siegel Report at 10–11. He determined that, "[g]iven [Plaintiff's] difficult early life experiences and relative lack of familial support," having an accommodating work environment was crucial to her well-being.

---

[3] The Court notes that it is unclear whether Dr. Siegel concluded that the Plaintiff *developed* depression as a result of alleged discrimination or that the Plaintiff's symptoms of depression were *exacerbated* by the alleged discrimination. Dr. Siegel's report reflects the first conclusion (*i.e.*, that discrimination caused Plaintiff's depression), *see* Siegel Report at 11, but Dr. Siegel stated three times during his deposition that he reached the second conclusion (*i.e.*, that discrimination exacerbated Plaintiff's depression), *see* Siegel Dep. at 96, 184, 202. The difference is not material to the Court's decision to exclude Dr. Siegel's opinion.

*Id.* at 10. The alleged discrimination and other mistreatment thus "devastated her and exacerbated her symptoms, triggering severe depression and anxiety." *Id.* at 11.

Dr. Siegel's report does not address any possible alternative explanations for Plaintiff's condition. In particular, the report does not address the possibility that she is suffering from postpartum depression, even though Dr. Siegel knew that Plaintiff had recently given birth. *See* Siegel Report; Siegel Dep. at 90. When deposed, Dr. Siegel stated that he had considered such a possibility and had concluded that "postpartum depression may or likely could have been one of" "many factors that contributed to her depression." Siegel Dep. at 90. That conclusion does not appear in his report; he explained the absence of that conclusion by stating that his referral question had been how "the events in the Complaint potentially affect[ed] her mental functioning." *Id.* at 91.

Nor did the report discuss other potential contributing factors to Plaintiff's condition, such as financial stress (Siegel Report at 4) and her stepfather's recent attempt to have sex with her (Dkt. 70, Ex. 4 at 2). During his deposition, Dr. Siegel stated that he was not aware of the stepfather's actions, *see id.* at 200, although he did admit the Plaintiff had told him about her "trouble and stress with her husband," which appeared to originate from the family's difficult financial situation, *id.* at 52.

Dr. Siegel is the brother-in-law of Plaintiff's counsel, Abraham Melamed. *See id.* at 66–67. Between August 2017 and May 2018, at the request of Plaintiff's counsel, Dr. Siegel produced at least eighty psychological evaluation reports in employment discrimination cases for Mr. Melamed. *See id.* at 56–59, 85. In seventy-eight of those cases, Dr. Siegel concluded that the plaintiff's emotional distress was caused or exacerbated by the defendant(s). *See id.* at 63. Dr. Siegel has not prepared such reports for any other law firm. *See id.* at 66.

4

## II. DISCUSSION

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It provides that a person "qualified as an expert by knowledge, skill, experience, training, or education" may offer opinion testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The district court acts as a gatekeeper against unreliable expert testimony. *See United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). The proffering party bears the burden of establishing admissibility under Rule 702 by showing that (1) the expert is qualified; (2) the proposed opinion is based on reliable data and methodology; and (3) the proposed testimony would be helpful to the trier of fact. *See, e.g.*, *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005); *Estate of Jaquez v. City of New York*, 104 F. Supp. 3d 414, 426 (S.D.N.Y. 2015), *aff'd sub nom. Estate of Jaquez by Pub. Adm'r of Bronx Cty. v. City of New York*, 706 F. App'x 709 (2d Cir. 2017). Although Dr. Siegel appears to be qualified to render an expert opinion on Plaintiff's psychological condition, and his opinion would be helpful information for the jury, the Court nevertheless excludes his testimony because his opinion is not based on reliable data and methodology.[4]

---

[4] The Court also notes that, even if Dr. Siegel's report and testimony were admissible under Rule 702, he has failed to comply with Rule 26 of the Federal Rules of Civil Procedure. His report is not signed, and Dr. Siegel did not provide "a list of all other cases in which, during the previous 4 years, [he] testified as an expert at trial or by

**A. Qualification**

As a threshold matter, Dr. Siegel is qualified as an expert by his "educational background, training, and experience" in the field of psychology to render his opinion in the instant case. *Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, No. 11-CV-681, 2015 WL 5459662, at *2 (S.D.N.Y. Sept. 16, 2015). He is a licensed psychologist with advanced degrees and training in psychology, *see* Siegel Report at 12–15, and has experience treating patients suffering from depression and anxiety disorders, *see* Siegel Dep. at 102–103. Those credentials suffice to satisfy "a liberal view of the qualification requirements of Rule 702." *Luitpold*, 2015 WL 5459662, at *2 (quoting *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004)); *see also Tardif v. City of New York*, 344 F. Supp. 3d 579, 599 (S.D.N.Y. 2018) (finding expert psychologist qualified to testify on PTSD because of "his advanced education in psychology and his experience working with at least some inmates who have PTSD").

Defendants argue that Dr. Siegel has no training or experience in "forensic psychology applicable in the employment law context." Dkt. 71 at 9. But such narrow specialization is not needed, so long as the expert has qualifications "in a general field closely related to the subject matter in question." *Tardif*, 344 F. Supp. 3d at 598. Here, Dr. Siegel is "a psychologist [who] seeks to testify on a matter squarely within the field of psychology." *Id.* at 599. Although Defendants argue that clinical and forensic psychology are too dissimilar, *see* Dkt. 71 at 10, no

---

deposition," even after being put on notice and given an opportunity to supplement after his deposition. Fed. R. Civ. P. 26(a)(2). As such, Dr. Siegel's report is not admissible, unless the failure is "substantially justified or [. . .] harmless." Fed. R. Civ. P. 37 (c)(1); *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 298 (2d Cir. 2006) (explaining that evidence of bad faith is not required and explaining relevant factors). Plaintiff has not attempted to show that the failure to disclose past depositions is harmless or justified, or made any apparent remedial efforts. Rule 26 is therefore an alternative basis to exclude Dr. Siegel's report and testimony. *See Mfon v. Cty. of Dutchess*, No. 14-CV-6922, 2017 WL 946303, at *4–5 (S.D.N.Y. Mar. 9, 2017) ("[W]here Plaintiff makes no attempt to amend the Report, justify or assert the harmlessness of the omissions, or even address Defendants' arguments regarding the failure to comply with Rule 26, preclusion is appropriate."), *aff'd*, 722 F. App'x 46 (2d Cir. 2018).

court in the Second Circuit appears to have drawn that distinction or used it as a basis to exclude a psychologist's testimony.

In short, Dr. Siegel is qualified to render an opinion on the Plaintiff's mental condition and its cause.

**B. Reliability**

The Court finds Dr. Siegel's opinion is based on unreliable data and methodology, with respect both to his diagnosis that Plaintiff suffers from Major Depressive Disorder with Anxious Distress and to his conclusion about causation, namely, that Defendants' treatment of Plaintiff caused her condition.

To determine whether a proposed expert opinion is reliable, courts must consider several factors, including "whether a theory or technique . . . can be (and has been) tested"; "whether the theory or technique has been subjected to peer review and publication"; whether uniform "standards controlling the technique's operation" exist; and whether the theory or technique enjoys "general acceptance" within an identifiable relevant scientific or professional community. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593–94 (1993).

While the *Daubert* factors do not constitute a rigid checklist and the reliability inquiry is a flexible one, the expert's analysis must nonetheless be "reliable at every step." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). Put differently, there cannot be "too great an analytical gap between the data and the opinion proffered" connected only by the "*ipse dixit* of the expert." *Id.* at 266 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). In short, the Court's ultimate objective is to ensure that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

7

1. **Diagnosis**

Dr. Siegel's opinion that Plaintiff suffers from Major Depressive Disorder with Anxious Distress is unreliable because of the analytical gaps between the DMS-V guidelines that he purported to follow and his diagnosis.

First, Dr. Siegel never reviewed any of the Plaintiff's medical records or made any effort to contact her medical providers. *See* Siegel Dep. at 189–90. Failure to review medical records is significant in this case because the DSM-V guidelines that Dr. Siegel purportedly relied on explicitly require a determination that "[t]he episode is not attributable to the physiological effects of . . . another medical condition." Siegel Report at 6. Rather than consult Plaintiff's medical records to rule out the possibility that her symptoms stemmed from other medical conditions, Dr. Siegel simply "asked her about medical history." Siegel Dep. at 9. Plaintiff denied any history of drug or alcohol abuse, *see* Siegel Report at 4, and "provided [him] with the *relevant* history of her gallbladder surgery [. . .] and what happened during the incidences [of pregnancy complications]," Siegel Dep. at 9 (emphasis added). Dr. Siegel acknowledged that he and Plaintiff did not discuss postpartum depression, even though he acknowledged the possibility that Plaintiff developed depressive symptoms as a result of giving birth. *See id.* at 11, 207.

Plaintiff's lay judgment about what constitutes her relevant medical history was apparently accepted at face value by Dr. Siegel, who made no effort to corroborate any information the Plaintiff provided during the interview—or to supplement her self-report with any information that she may have failed to disclose, either inadvertently or intentionally. *See id.* at 31. In fact, Dr. Siegel stated that he "felt it unnecessary" to corroborate what the Plaintiff was telling him because he "felt that [he] had information to draw [his] conclusion in this case." *Id.*

8

at 31. But "[t]he expert feeling comfortable, without more, is not a sound methodology under *Daubert*." *Tardif*, 344 F. Supp. 3d at 601 (internal quotation marks omitted).

To be clear, the Court does not hold that failure to review medical records renders an expert psychologist's opinion *per se* unreliable.[5] Although a methodology involving "a medical history interview, patient observation, a physical examination, and administration of standard psychological tests" is "routinely accepted under *Daubert*," *Qube Films Ltd. v. Padell*, No. 13-CV-8405, 2016 WL 888791, at *2 n.1 (S.D.N.Y. Mar. 1, 2016), there is no definitive checklist in the reliability inquiry, *see Daubert*, 509 U.S. at 593. There may well be scenarios in which a psychologist can reliably diagnose a patient without the aid of medical records, but, in this case, failure to review Plaintiff's medical records is particularly troubling because an express requirement of the DSM-V guidelines was not met. The failure to review Plaintiff's medical records is also particularly problematic because, as explained *infra*, Plaintiff does not appear to be an entirely accurate historian when it comes to discussing life events that might be relevant to her mental condition.[6]

---

[5] The Court notes, however, that there appear to be very few cases in the Second Circuit in which the court has been presented with an expert medical opinion where the expert, either when diagnosing the patient or determining causation, did not consult the patient's medical records. And in these very few cases, courts have invariably found such opinions to be unreliable. *See, e.g.*, *Matthews v. Hewlett-Packard Co.*, No. 15 CIV. 3922, 2017 WL 6804075 (S.D.N.Y. Dec. 22, 2017) (finding expert psychologist's testimony that harassment at the defendant's workplace caused the plaintiff to suffer from depression to be unreliable where the expert did not review medical records or relevant psychological literature, did not perform any standard psychological tests, and did not perform a differential diagnosis); *Mazzocchi v. Windsor Owners Corp.*, 204 F. Supp. 3d 583 (S.D.N.Y. 2016) (finding expert psychologist's diagnosis of bipolar disorder to be unreliable where the expert did not review medical records or conduct patient interview); *Li v. Aponte*, No. 05 CIV. 6237, 2009 WL 1285928 (S.D.N.Y. May 5, 2009) (finding expert testimony regarding the cause of the plaintiff's herniated disc to be unreliable where the expert relied solely on an oral medical history taken from the plaintiff and failed to obtain earlier medical records).

[6] The review of medical records also takes on added importance given the potential unreliability of some of the psychological tests used by Dr. Siegel. For instance, Dr. Siegel admitted that he "rarely use[d]" the two drawing tests in forensic cases because they are less standardized and more reliant on the psychologist's interpretation. Siegel Dep. at 117, 162–63. He used them with Plaintiff because he "was on vacation in Florida" and "did not have [his] Bender Cards" to conduct the test he normally used. *Id.* at 116. This slap-dash approach hardly seems to exhibit "the same level of intellectual rigor that characterizes the practice of an expert" in the field of psychology. *Kumho*, 526 U.S. at 152. Conceptually, the drawing tests themselves, both of which appear to be designed primarily

Second, Dr. Siegel provided no analysis to show how the DSM-V guidelines were actually applied to reach his diagnosis. To diagnose Major Depressive Disorder with Anxious Distress, the DSM-V Part A requires five (or more) symptoms be present during the same 2-week period and that "at least one of the symptoms is either (1) depressed mood or (2) loss of interest or pleasure." Siegel Report at 6. The list of symptoms in the DSM-V includes depressed mood, markedly diminished interest or pleasure in activities, significant weight loss when not dieting, insomnia or hypersomnia, psychomotor agitation or retardation, fatigue or loss of energy, feelings of worthlessness, diminished ability to think or concentrate, and recurrent thoughts of death. *See id.* at 6. After reciting the DSM-V requirements, Dr. Siegel concluded, without explanation, that the Plaintiff "clearly meets criteria of Major Depressive Disorder with Anxious Distress." *Id.* at 6.

Nowhere in the ensuing five pages of the report does Dr. Siegel offer any indication of which symptoms, if any, Plaintiff actually exhibited. *See id.* at 7–11. Although he does describe the various psychological tests he administered, his discussion of the test results is entirely conclusory and gives the reader no clue as to how the test results fit into the DSM-V guidelines, if at all. For example, the report states that "[o]n the DASS Depression Scale, [Plaintiff] scored in the Extremely Severe range [indicating] that she is experiencing acute depression symptoms." *Id.* at 7. Such "acute depression symptoms" are never broken down to specific symptoms that could be matched to the list of symptoms in the DSM-V guidelines. The lack of explanation as to how the individual test results are melded into an overall diagnosis is particularly concerning because Dr. Siegel himself acknowledges that some of the tests are not as reliable as his

---

for use with children, border on dream interpretation or tarot-card reading, as they rely on Dr. Siegel's extrapolating Plaintiff's mental state based on, for example, the placement of a window on a house. *See* Siegel Dep. at 161.

preferred methodology, that no single test is determinative, and that all of the tests must be considered together. *See* Siegel Dep. at 154, 163.

Dr. Siegel's diagnosis that Plaintiff suffers from depression and anxiety is therefore "connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146. Thus, "there is simply too great an analytical gap between the data and the opinion proffered" to satisfy the reliability requirement of Rule 702. *Id.* at 146.

### 2. Causation

Dr. Siegel's conclusion that Defendants caused Plaintiff's depression and anxiety is also unreliable because, among other reasons, he failed to address obvious alternative causes, including postpartum depression.

When a medical expert gives an opinion on causation, rather than merely a diagnosis, "the expert typically performs additional analyses or tests, such as a 'differential diagnosis' test, to isolate other potential causes of the illness." *O'Loughlin v. USTA Player Dev. Inc.*, No. 14 CV 2194, 2016 WL 5416513, at *5 (S.D.N.Y. Sept. 28, 2016). "While an expert need not rule out every potential cause in order to satisfy *Daubert*, the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant." *Matthews*, 2017 WL 6804075, at *2 (quoting *DeRienzo v. Metro. Transp. Auth.*, 694 F. Supp. 2d 229, 236 (S.D.N.Y. 2010)).

At the time of the clinical interview, Dr. Siegel was aware that Plaintiff was six months postpartum, and yet he made no inquiries to determine whether postpartum depression could be the cause of her current condition. *See* Siegel Dep. at 207–08. Nor did Dr. Siegel discuss in his report the possibility of postpartum depression or even mention the fact that Plaintiff had

11

recently given birth.[7] *See* Siegel Report. The failure to do so is glaring because Dr. Siegel was well aware that patients can be depressed postpartum. *See* Siegel Dep. at 89. Moreover, he had specifically "treated postpartum depression patients and helped them manage their employment stress in a treatment setting." *Id.* at 88. Under these circumstances, postpartum depression would have been an "obvious alternative cause" that should have been addressed as part of a reliable causation analysis. *Matthews*, 2017 WL 6804075, at *2 (quoting *DeRienzo*, 694 F. Supp. 2d at 236).

Aside from postpartum depression, there were several other alternative (though perhaps less obvious) potential causes of Plaintiff's depression that Dr. Siegel also failed to address in his report. For example, Dr. Siegel did not discuss whether Plaintiff's difficult financial situation after her employment was terminated could have contributed to her depression, even though Plaintiff told him she and her husband "ha[d] financial stress" and it was "hard to raise the children." Siegel Dep. at 52. In fact, she even "saw a psychiatrist in GA [partly] due to the stress she experienced related to her desperate financial situation," as Dr. Siegel acknowledged in his report. Siegel Report at 4.

Furthermore, Plaintiff told a psychiatrist in New Jersey, whom she saw less than three months before Dr. Siegel's evaluation, that her mother's husband had recently attempted to have sex with her, having made similar attempts "in the past when she was a little girl." Dkt. 70, Ex. 4 at 2. According to the New Jersey psychiatrist's treatment notes, Plaintiff herself described this renewed sexual advance from her stepfather as one of the "triggers to her depression,"

---

[7] During his deposition, Dr. Siegel testified that he had considered the fact that a woman might suffer from postpartum depression six months to a year after childbirth. *See* Siegel Dep. at 90. He apparently even concluded that "postpartum depression may or likely could have been one of" "many factors that contributed to her depression." *Id.* at 90. But the report reflects no such deliberation. *See* Siegel Report. To date, Dr. Siegel has provided no "reasonable explanation for dismissing" postpartum depression as the most significant cause of Plaintiff's current depression. *Matthews*, 2017 WL 6804075, at *2 (quoting *DeRienzo*, 694 F. Supp. 2d at 236).

among other life events such as losing her job and her house. *Id.* at 2. Dr. Siegel was unaware of the unwanted sexual advances, *see* Siegel Dep. at 200, because he had not obtained or reviewed the Plaintiff's medical records, nor did he apparently take an adequate history during his clinical interview. In any case, Dr. Siegel has made no effort to offer a "reasonable explanation for dismissing" the possibility that the Plaintiff's depression could have been caused by her stepfather's sexual advance. *Matthews*, 2017 WL 6804075, at *2 (quoting *DeRienzo*, 694 F. Supp. 2d at 236).

The usual exceptions to the need for a differential diagnosis are not applicable here. A patient's treating physician generally does not need to perform a differential analysis in order to reach a conclusion on causation. *See id.* at *3 (citing *Caserto v. Metro-North R.R. Co.*, No. 14-CV-7936, 2016 WL 406390, at *1 (S.D.N.Y. Feb. 2, 2016); *Green v. McAllister Bros., Inc.*, No. 02 Civ. 7588, 03 Civ. 1482, 2005 WL 742624, at *11 (S.D.N.Y. Mar. 25, 2005); *Santoro v. Signature Constr., Inc.*, No. 00 Civ. 4595, 2002 WL 31059292, at *4 (S.D.N.Y. Sept. 16, 2002)). A differential diagnosis is also not necessary if the connection between the injury and its source would be obvious to a layperson. *See id.* at *3 (citing *Caserto*, 2016 WL 406390, at *1; *Roman v. Sprint Nextel Corp.*, No. 12–CV–276, 2014 WL 5026093, *11–12 (S.D.N.Y. Sept. 29, 2014)). Neither of those situations describes this case.

Finally, courts have held that the failure to perform a differential diagnosis is not fatal if there are "otherwise sufficient indicia of reliability." *Id.* at *4. *See O'Loughlin*, 2016 WL 5416513, at *5–6 (holding that differential diagnosis was not necessary where the expert relied on medical records, literature, and interviews with plaintiff, and applicable law only required the alleged cause to be a substantial factor); *Figueroa v. Boston Sci. Corp.*, 254 F. Supp. 2d 361, 367 (S.D.N.Y. 2003) (holding that differential diagnosis was not necessary where the expert had

reviewed witness depositions, medical records, and peer-reviewed scientific literature, and a strong temporal connection existed between the incident and injury). As the preceding discussion shows, there are no such "otherwise sufficient indicia of reliability" in this case. *Matthews*, 2017 WL 6804075, at *4. Dr. Siegel relied solely on the Complaint and the Plaintiff's own statements, without consulting her medical records or any scientific literature. When asked about postpartum depression during his deposition, he testified that it likely could have contributed to her depression; he has provided no explanation why he then concluded that Defendants' treatment of Plaintiff, rather than postpartum depression, was the cause of her developing depression in the first instance. *See id.* at *4 (finding expert's testimony not otherwise sufficient because he did not review medical records or conduct psychological tests); *Tardif*, 344 F. Supp. 3d at 602 (finding expert's testimony not otherwise sufficient because he did not review medical records and could not supply further evidence regarding obvious alternative causes when asked). In this case, Dr. Siegel's failure to perform a differential diagnosis is, therefore, fatal to the admissibility of his opinion on causation.[8]

## C. Relationship

An expert may be excluded if the expert has a clear conflict of interest or bias of an extraordinary degree. *Compare Proteus Books Ltd. v. Cherry Lane Music Co.*, 873 F.2d 502 (2d Cir. 1989) (finding expert disqualified where expert introduced plaintiff and defendant and facilitated their first agreement), *and Chichilnisky v. Trustees of Columbia Univ. in City of New York*, 1994 WL 658428 (S.D.N.Y. Nov. 22, 1994) (finding expert disqualified where expert used

---

[8] Because the reliability inquiry disposes of the motion, the Court need not determine whether Dr. Siegel's report and testimony would be helpful to the trier of fact. The Court notes, however, that pages 4 and 5 of the report would not be helpful to the trier of fact because they simply narrate facts learned from the Plaintiff. *See Tardif*, 344 F. Supp. 3d at 602 (excluding portion of an expert's report that simply "recites [Plaintiff's] own narration of her personal history" and is not based on expert knowledge or experience). It would usurp the role of the jury to allow an expert to serve as a vehicle for the proffering party's factual narrative. *See Luitpold*, 2015 WL 5459662, at *3.

to live with plaintiff), *and Lippe v. Bairnco Corp.*, 288 B.R. 678 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004) (finding expert disqualified where expert is proffering party's attorney), *with Tedone v. H.J. Heinz Co.*, 686 F. Supp. 2d 300 (S.D.N.Y. 2009) (not excluding expert for bias where expert was employed by defendant for 31 years), *and Keystone Mfg. Co. v. Jaccard Corp.*, 394 F. Supp. 2d 543 (W.D.N.Y. 2005) (not excluding expert for bias where expert is vice president of plaintiff corporation, has an interest in outcome of case, and has previously received assistance from corporation's counsel). The threshold for disqualifying an expert on this basis is high because many expert witnesses have some level of discernible bias or appearance of bias, and a complete lack of bias is not required. *See Lippe*, 288 B.R. at 688. Because the reliability inquiry disposes of the case, the Court need not determine whether Dr. Siegel's personal and financial relationship with the Plaintiff's counsel rises from being mere impeachment material to being disqualifying.

### III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Preclude Plaintiff's Expert Yaakov Siegel from Offering his Report or Testifying is GRANTED. The Clerk of Court is respectfully directed to terminate the open motion at docket entry 69.

A jury trial shall commence at **10:00 A.M. on November 11, 2019**. Any motions *in limine* must be filed by **September 6, 2019**; any responses in opposition are due **September 20, 2019**. The parties must submit a joint pretrial order, pre-marked trial exhibits, joint requests to charge, and proposed *voir dire* questions,[9] no later than **October 4, 2019**. All trial counsel must appear for a final pretrial conference on **October 31, 2019, at 2:00 P.M.** All submissions must comply with the undersigned's Individual Practices. If the parties are jointly interested in a

---

[9] Proposed *voir dire* questions should focus specifically on the facts of this case. The Court has standard questions that will cover general matters such as connections to attorneys, personal experience with litigation, etc.

15

referral for a settlement conference before their assigned Magistrate Judge, they need only request a referral.

**SO ORDERED.**

Date:  August 2, 2019
      New York, New York

_____
**VALERIE CAPRONI**
**United States District Judge**